No. 102.—WILLIAM NEAL, plaintiff in error, *vs.* NANCY FARMER, defendant.

[1.] In cases of felony, the civil remedy is suspended until the offender is prosecuted to conviction or acquittal.

[2.] African slavery held never to have existed in the Island of Great Britain by the Common Law, by Statute, or by the Laws of Nations.

[3.] The Law of Villenage obsolete in England.   Quere?

[4.] If not obsolete, but of force in 1732, when the colony of Georgia was settled: *Held*, that it had no application to African slavery in England or in Georgia.

[5.] The Common Law of England held to be inapplicable to the institution of slavery, except to protect the rights of masters.

[6 ] The slave trade held to be recognized as a lawful commerce, under the Law of Nations, and that law obligatory upon the States of the world, unless repudiated by treaty or positive law.

[7.] *Held*, that by the comity of nations, when a slave escapes into, or is found within the jurisdiction of a State where slavery is not recognized, it is the duty of that State, upon the demand of his rightful owner, to deliver him to be taken back to the State where, by law, he is a slave.

[8.] The origin and character of property in slaves in this State defined.

[9.] It is not felony in Georgia, by the Common Law, to kill a slave, and the only legal restraint upon the power of the master over the person of the slave in Georgia, is such as is imposed by Statute.

Trespass, &c. in Greene Superior Court.   Tried before Judge JOHNSON, March Term, 1851.

This was an action brought by Nancy Farmer against William Neal, to recover damages for the killing of a negro slave, the property of Mrs. Farmer.   On the trial, the plaintiff proved the killing and closed.   The defendant introduced no testimony. The Jury found a verdict for plaintiff for $825.

The defendant then moved for a new trial, on the following grounds, among others:

1. That the Jury found for the plaintiff, when there was no evidence that the plaintiff had prosecuted the defendant either to conviction or acquittal for the killing.

2. That the Court erred in omitting to charge the Jury on the

Neal *vs.* Farmer.

point of law stated in the above ground, when defendant's counsel had distinctly stated the point in his argument to the Jury, and insisted upon the same in bar of the plaintiff's right to recover, though the counsel did not ask the Court to charge upon the said point in writing.

The Court refused to grant the new trial, upon the ground that the killing of a slave was not a felony at Common Law, and that it was not necessary for plaintiff to prosecute the offender criminally, before commencing her civil action. On this decision error has been assigned.

JAMES A. MERIWETHER, for plaintiff in error.

The first question to be considered is, whether the trespass alleged to have been committed by Neal, was such an act as that plaintiff's right of action in relation thereto was suspended until defendant had been prosecuted to conviction or acquittal. In all cases of felony at Common Law, the right of plaintiff to sue for damages is suspended until he prosecutes the defendant to conviction or acquittal. 5 *Ga. Rep.* 404.

Two points are to be considered. 1st. Was the killing of the slave murder? 2d. Is the murdering of a slave felony at Common Law?

1st. The killing of a human being is presumed to have been maliciously done, and this presumption must be rebutted by proof of facts, reducing the offence from murder to manslaughter or justifiable homicide.

2d. The murder of a slave is felony at Common Law. *See definition of murder,* 1 *East's Cr. Law,* 214.

The killing of *any person* "*in the peace of the King,*" was murder, and it was felony without benefit of clergy. This principle applied to England and her colonies.

Having shown that the murder of *any* person was *felony,* and slaves being persons, it is for those who claim the *right* to take the life of a slave, to show the law which creates an exemption in their favor.

The master had no power over the life of his slave by the

Common Law. It has been refused to him since the birth of Christ. *Cooper's Justinian,* 411.

Pure slavery, that which gives the owner a right over the life of his slave, never did exist in England or any of the American colonies. 1 *Blk. Com.* 423.

Trover was said not to lie, because the owner had not such an absolute property in his negro that he might kill him. *Cooper's Justinian,* 414, citing *Salk.* 666. *Ld. Ray.* 1274.

If a master corrects his servant with a bar of iron, or strikes him with a sword, and so kills him, it is murder. 2 *Coventry & Hughes,* 958. *Gray's Case,* 64, 133. *Kent's Case, Skin.* 668.

These cases show that the right to take the life of a slave never belonged to a master, either in England or the Colonies. The murder of a slave was, therefore, felony.

The Act of 1770, (Georgia Legislature,) mitigated the severity of the punishment, but made it felony to kill a slave. *Watkins' Digest,* 178.

But were there persons in England known as slaves, *who were in the power of the King?*

We reply, that slavery existed in England, as it did in Georgia, up to the year 1772, the period of the trial of Sommerset, (the negro,) *practically and legally* ever since.

Slavery existed by the Common Law of Nations, as well as by the Civil Law, and, consequently, went into any nation where not prohibited by Statute. *Cooper's Justinian, p.* 11, §§1, 2, 3, 4.

It existed in England before the Norman conquest, and African slavery was there so late as 1772.

It existed before the Norman conquest, and the slaves were represented by their master, as our slaves are now. *See History Anglo Saxon Race, vol.* 1, *pp.* 292, 337.

This condition continued after the conquest, giving the master the same power of sale, the same right to his labor, &c. 2 *Bl. Com.* 92, 93, 94.

These conditions were established by the Law of Nations. *Cooper's Justinian, p.* 254, §§1, 2, 3, 4, *and pp.* 16, 17, §§1, 3.

Slaves are held upon the same terms in Georgia at this time. Villeins were nearly all manumitted by the influence of the

Clergy, except those they held themselves. *Cooper's Justinian,* 414.

In 1562, England began the African slave trade, and introduced African slaves in place of white slaves. 1 *Bancroft's History U. S.* 173. 11 *Am. Encyclopedia,* 433, '34.

The slave trade exists by the Law of Nations. 5 *Eng. Com. Law Rep.* 315.

Trover will lie for a negro slave. It is as much property as any other thing. 1 *Ambler,* 76. *See Lord Stowell's Decision,* 1827.

In 1670, the Royal African Company was chartered by Queen Elizabeth, to deal in slaves.

Thus slavery came into the Colonies and into England, both by the Common and Statute Law.

African slavery continued to exist in England, practically, until 1772. *See* 11 *Am. Encyclopedia,* 351. 20 *State Trials,* 63.

That decision turned loose many slaves in England, which caused the establishment of the Colony of Sierra Leone. *Ib.* 398.

F. H. CONE, for defendant in error.

Counsel for defendant in error submits the following points and authorities :

1st. This Court will not grant a new trial, on the ground that the verdict was contrary to evidence, when it has been refused by the Circuit Judge, if there is any evidence to support the verdict. *Peck vs. Lane,* 2 *Kelly,* 15. *Roberts vs. State,* 3 *Kelly,* 322. *Armis vs. Barker,* 4 *Kelly,* 170. *Craft vs. Jackson, Ib.* 360. *Garland vs. Millan,* 6 *Ga. Rep.* 310. *Stroud vs. Mays,* 7 *Ib.* 269. *Killan vs Sistrunk et ux.* 7 *Ib.* 283.

2d. A new trial should not be granted where the party has had a fair trial upon the merits of his case, and justice has been done. *Goode vs. Love's Adm'rs,* 4 *Leigh,* 635.

3d. Killing a slave is not felony at Common Law, and, therefore, there was no necessity of alleging and proving that the defendant had been prosecuted for the offence of killing a slave,

Neal *vs.* Farmer.

the subject matter of the action. 1 *Coke's Ins.* 487, *note g.* · *Ib.* 403. *Forbes vs. Cochran*, 2 *B. & Cres.* 448. *Rees' Cyclopedia*, vol. 34, *tit. Slave. State vs. Boone, Taylor's Rep.* 246. *State vs. Mann*, 2 *Dev. Law*, 263. *Fable vs. Brown*, 2 *Hill's Ch.* 389. *Jackson vs. Lary*, 5 *Cowen*, 397. 20 *State Trials*, 1 *Somersett's Case.* 4 *Bla.* · *Com.* 151. *Watkins' Dig.* 178. *Prince's Dig.* 913. *Ib.* 656. *Bible—Exodus*, c. 21, *vs.* 12, 20, 21: *Numb.* c. 35, *v.* 17: *Lev.* c. 24, *v.* 17: *Deut.* c. 25, *vs.* 44, 45, 46.

3d. Even admitting that such allegation and proof were necessary, yet, after verdict, it is not competent for defendant to move for a new trial, on the ground that the Court did not charge the Jury, that such proof was necessary, when the defendant did not request the Court to make such charge—the mere failure of the Court to charge upon a point upon which the Court is not requested to charge, not being a ground of error. *Simpson vs. Blount*, 3 *Dev. Law*, 34. *Culbreath vs. Gracy*, 1 *Wash. C. C. Rep.* 198. *Bolan vs. Peeples*, 1 *Brevard*, 109.

*By the Court.*—NISBET, J. delivering the opinion.

The rule for a new trial in the Court below, was based upon the grounds that the killing of a slave is a felony at Common Law, and that in all cases of felonies, the civil remedy is suspended until the offender is prosecuted to conviction or acquittal. The reply of the plaintiff was, that it is not a felony at Common Law to kill a slave. The presiding Judge held with the plaintiff, and his opinion on this point is excepted to.

[1.] In *Adams vs. Barrett*, this Court held, that in Georgia, in cases of treason and of such crimes as are felonies by the Common Law, the person injured is not entitled to his action, until the offender is prosecuted to a conviction or acquittal. 5 *Ga. Rep.* 404. This was no *obiter*, as the Circuit Judge seemed to think. It is true, that the case might have been decided without an opinion upon this question, yet it was made in the bill of exceptions, solemnly argued, a judgment invoked and rendered. We consider it settled in that case, and shall not now open it. It is assumed by the plaintiff in error, that the settlers of the

Colony of Georgia brought with them the Common Law of
Great Britain, so far as it was applicable to their condition, and
that by that law, as it stood in England in 1732, when the Co-
lony of Georgia was settled, and as it was held throughout our
entire colonial history, and is still held in Georgia, it is felony
for a white man to kill a slave.    The first of these assumptions
is not controverted.    It is not at all questionable that the Com-
mon Law, so far as it was applicable to the condition of such a
community, was of force in the Colony of Georgia, and so con-
tinued until modified by the Acts of the Colonial Legislature,
after that was organized in 1751.    *Stephens' History of Georgia,*
216 *to* 220, 247, '48.

It being farther conceded, that after the organization of the
State Government, the Common Law was adopted by an Act of
the Legislature, so far as it was not contrary to the Constitution,
laws and form of government of the State of Georgia, the
question becomes this simply, to wit: Is it a felony at Common
Law to kill a slave ?    It is a question of great interest and gravity,
and if we err in our judgment upon it, it affords me real pleas-
ure to say, that it will not be for the want of such instruction as
may be derived from the ablest and most satisfactory argument.
We are pleased to record our sense of the value of the discus-
sion which this cause has elicited at the hands of the counsel,
Messrs. Cone and Meriwether.    The farther propositions of the
counsel for the plaintiff in error, who was defendant below, are
that slavery of like character with African slavery, as it exists in
this country, existed in *England* from the earliest periods of the
history of that State—for example, among the *Saxons* before the
conquest, and after the conquest also, in the form of villenage ;
that the killing of a slave under the *Saxon* sway was a felony,
and the killing of a villein under the Common Law was also a
felony.    From these two propositions he deduces the conclusion,
that the killing of a negro held in servitude in England, whether
primarily introduced there as a slave from Africa, or coming
into England from her own Colonies or other States where slave-
ry is recognized, would be also a felony.    Hence, also, the ad-
ditional inference, that if a felony by the Common Law in Eng-

land, it was equally a felony in the Colony of Georgia, where that law was of force after the introduction of slavery, about the year 1749. *Stephens' History of Georgia,* 285 *to* 312.

That African slavery existed, in fact, in England, as late as 1772, under the sanction of the Laws of Nations, and Acts of the British Parliament, which authorized the slave trade with her Colonies, and was recognized by the decisions of the highest Courts in that country; that the negro there occupied the same position as a slave, that he occupied as such in the Colony; that in England, notwithstanding this *status,* his life was under the protection of the Common Law, and it was a felony to kill him; and if so, equally a felony to kill him in the Colony of Georgia.

[2.] Pure slavery—slavery as unconditional as the African slavery of this day—existed under the Saxon Government. "Under the Saxon Government," says *Blackstone,* "there were a sort of people in a condition of downright servitude, used and employed in the most servile works, and belonging, both they and their children and effects, to the lord of the soil, like the rest of the cattle or stock upon it." 2 *Blk. Com.* 92, 93. *Temple's Introd. His. of Eng.* 59. *Turner's Hist. Anglo Saxon Race, pp.* 292, 337. It originated, no doubt, by captivity in war, and sprung out of the wars between the Britons and Saxons, between the Danes and the Saxons, and among the different States of the *Heptarchy.* What was the condition of the slaves of that early day—what the limitations upon the rights of the master, it is difficult to determine. There is no reason, however, to believe but that *Blackstone* gives a true account of the matter. Property in the bondsman, was as absolute as in cattle or other stock. I do not question but that it was as absolute as that which exists at this time among the tribes and chieftains of Africa. However analagous the slavery of the Saxon age, to the African slavery of the Colony of Georgia, anterior to any legislation upon the subject, I consider that it can have no bearing upon the question before me. It became extinct early after the conquest. It was rapidly, after that event, merged in the institution of villenage, and its distinctive features lost. It existed anterior to the

Common Law; for however that system of laws may, to some extent, be traced to the times before the Norman conquest, yet it is certainly true, that as a defined, intelligible system, it had no existence before that epoch of English history.   According to *Macaulay,* indeed, it rose to the dignity of a science not until *Magna Charta.* 1 *Macaulay's Hist. of Eng.* 16.   We look in vain, certainly, to the Common Law for traces of Saxon slavery, as an institution under its protection.   The English constitution can scarcely be said to have assumed its first great outlines, until the fusion of the Britons, Saxons, Danes and Normans into one race—the enterprising, wise and all-conquering people which we are accustomed to designate as the Anglo-Saxon race—to which we trace our original.   It is not very profitable for the lawyer, in search of Common Law principles, to undertake the explanation of these Cimmerian regions of British history.   It is a region of mists and fogs and darkness.·  The servitude of those times may shed light upon slavery—may illustrate the character of slavery in its first formations—may serve to confirm that idea of title to, and property in a slave, which we of the Southern States of the American Union at this mo-. ment entertain; but I apprehend that a Judge, sitting to determine what was the *status* of the slave under the Common Law, can derive from its consideration no light to guide him, because I consider that the Common Law recognizes but one species of slavery as having existed in England under its sanction at any time, and that is *villenage.*   It was stated by Mr. *Hargrave,* in his learned argument in the Somersett case, that there was no provision in the laws of England to regulate any slavery, but that of *villenage,* and, therefore, he insisted that no slavery could be lawful in England, except such as would consistently fall under that denomination.   This position, and also the inference, seem to have been conceded by the Court and the counsel. Hence, the effort of Mr. *Dunning,* the counsel for Stewart, the owner of Somersett, was, among other efforts, to bring his case under the ancient law of the bond villein.   20 *vol. State Trials,* 1.

[3.] So here, Judge Meriwether seeks to do the same thing;

and if it be true, that the *status* of the African slave be the same with that of the feudal villein, and the Law of Villenage was of force, at the settlement of the Colony of Georgia, in England, one of the strongest positions in his argument is gained; because, if the same, it comes under the Law of Villenage, and by that law it was a felony to kill a villein—consequently a felony to kill an African slave.    The question, then, which we next encounter in this discussion is, were the laws which recognized the institution of villenage, and protected the life of the villein, a part of the Common Law, when this Colony was settled in 1732?

Lord *Coke* says, that the law favors life, liberty and dower. This favoritism to liberty seems gradually to have operated in the destruction of the bondage of the villein.    The "good nature and benevolence of many Lords of manors," having permitted their villeins and their children to enjoy their possessions without interruption, in a regular course of descent, the Common Law, of which custom is the life, gave them title to prescribe against their lords.    Hence sprang titles by copy of Court roll, and villeins "sprouted up into copy holders"—their persons being enfranchised by manumission or long acquiescence.    They were manumitted expressly or by implication.    Expressly, by deed; impliedly, where a lord bound himself by bond to a villein, to pay him a sum of money, granted him an annuity by deed, or gave him an estate in fee, for life or years.    So, also, if a lord brought an action against his villein, this freed him.    It seems, too, that the ghostly counsels of the Catholic clergy came in aid of the policy of the law in favor of liberty.    Sir *Thomas Smith,* according to *Blackstone,* tells us, that "The Holy Fathers, Monks and Friars, had, in their confessions, and especially in their extreme and deadly sicknesses, convinced the laity how dangerous a practice it was for one christian man to hold another in bondage.    So that temporal men, by little and little, by reason of that terror in their consciences, were glad to manumit all their villeins.    But the said Holy Fathers, (he proceeds,) with the Priors and Abbots, *did not* in like sort by theirs, for they also had *a scruple in conscience* to impoverish and despoil the

church, so much as to manumit such as were bound to their churches, or to the manors which the church had gotten, and *so kept their villeins still.*" This conduct of the Holy Fathers was certainly characteristic. The result of all which, however, was to abolish tenures by villenage and villein bondage; so much so, that when tenure in villenage was abolished by Statute, in the 12th year of the reign of Charles II. there was hardly a pure villein left in the kingdom. According to Lord *Mansfield,* the last confession of villenage in Court, (which was one of the ways in which men became villeins,) occurred in the time of the *sixth Henry.*

The institution, very much to the satisfaction of British lawyers, and judges, and statesmen, (although the latter were at the time fostering, by parliamentary enactments, the slave trade to Africa,) became substantially extinct in the latter years of the reign of *Elizabeth.* The last claim of villenage recorded in the British Courts, is stated to have occurred in the *fifteenth of James I.* Thus we learn how and when this institution became extinct, and the laws which sanctioned it became, in fact, obsolete. Afterwards, in 1661, in *the 12th Charles II.* villein tenures were abolished by Act of Parliament. 2 *Black. Com.* 94, '5, '6, '7. *Litt.* §§204, '5, '6, 208. *Sir Thomas Smith's Commonwealth, b.* 3, *ch.* 10. 1 *Noy.* 27. 11 *Harg. St. Tr.* 342. *Bac. Abr. tit. Villenage,* 66. *Brit. cap.* 31. *Mir. cap.* 2, §18. *Fitzh. Nat. Br.* 78, *C. D. Somersett's Case, passim,* 20 *State Trials,* 1.

There were two kinds of villeins—villeins *regardant,* and villeins in *gross.* "A villein *regardant* is, as if a man be seized of a manor, to which a villein is *regardant,* and he which is seized of the manor, or they whose estate he hath in the same manor, have been seized of the villein and his ancestors as villeins and neifs *regardant* to the same manor, time out of memory of man; and villein *in gross* is, when a man is seized of a manor, whereunto a villein is *regardant,* and granteth the same villein by his deed to another, then he is a villein in *gross,* and not *regardant.*" *Litt.* §181. The Statute of 12*th Charles II.* may be considered as affecting only the former kind of villeins, that

is *regardant,* inasmuch as its object was the abolition of the tenure of lands by villenage, and as having left villenage in *gross*, which was a servitude which belonged to the person of the lord, where it stood at Common Law.   I think this is the proper view of the effect of that Statute.   Let this be conceded then, and that the Common Law as to villeins in *gross* was not repealed by the Statute; then it seems to me that it ought to be regarded as obsolete.   This word is applied to such laws as have become inoperative by disuse, without being repealed.   Courts of Justice will not, with facility, declare any law obsolete, more particularly a Statute.   Disuse is evidence of the popular sentiment that a law is inexpedient, and ought not to be enforced.   Long disuse is a presumption of repeal, but in case of a Statute, is rebutted by the fact, generally susceptible of demonstration, that it has not been repealed.   The Courts, however, have gone so far as to hold Statutes obsolete, where the objects upon which they were intended to take effect, and the purposes for which they were enacted have, for a length of time, ceased to exist.   Reasonably the rule is less stringent as to a law founded on custom or immemorial use.   As use is the foundation of the Common Law, it is fair to infer its repeal, by long and well ascertained disuse.   Where the subjects or persons upon which a rule of the Common Law operates, have long ceased—where the records of the Courts for many years exhibit no action under it, it may be, and it would seem ought to be held as obsolete, and disregarded by Judges.   It is a familiar principle, that the reason of the law ceasing, the law itself ceases.   *7 Reps.* 69.   *Coke's Litt.* 70, *b.*   13 *Serg. & Rawl.* 447.   1 *P. A. Browne's Reps. Appendix,* 28.   4 *Yeates' R.* 181, 215.   *Rutherf. Inst. b.* 2, *c.* 6, §19.

As before stated, the last claim of villenage which the records of the British Courts exhibit, was in the fifteenth year of *James I.* in 1617.   This was one hundred and fifteen years before the settlement of the Colony of Georgia, and one hundred and fifty-five years before the trial of the Somersett case.   It is stated by Mr. *Hargrave,* that at the time of the last claim of villenage in the reign of James I. it was notorious, that the race of villeins

"was completely worn out," by the continual and united opera-
tion of deaths and manumissions. Thus it is clear, that the
Law of Villenage had gone into disuse in England, one hundred
and fifteen years before the settlement of Georgia, and that the
subjects of it had notoriously ceased to be, in 1617. It was, I
am constrained to believe, no part of the Common Law in 1732.
If this opinion be well founded, then there was no law in Eng-
land at that time, and there is none now, which recognized vil-
lien servitude. It did not and does not, therefore, exist, and all
the reasoning of the counsel, drawn from the fact that slavery
was recognized by the Common Law, in the form of villenage,
necessarily falls to the ground.

[4.] There is, however, higher ground than this, upon which
to rest our judgment. If the laws of villenage be not obsolete,
but still of force—if the institution of villenage was not extinct,
but now existent, I hold that no argument could be derived
from either, to prove that it ever was a felony in England to kill a
negro slave; because of the difference between villenage and
negro slavery, and the dissimilarity between the relations of
master and slave, and those of lord and villein. Villenage was not
a pure slavery. The unconditional slavery of the African race, as
it exists in Georgia, never did exist in Great Britain. I do not mean,
of course, in the *British Empire*, but in the *Island of Great Britain*.
It has never had a *status* under the Common Law. Villenage was
a feudal institution, and that form of it which we find in England,
was established there by *William the Conqueror*, and his successors.
The material for it in part, at least, was found by them, in the
slaves of the *Saxons*. At their hands, they received that enlarge-
ment which is found in a transition from pure slavery to villenage.
" On the arrival of the *Normans* here, (writes *Blacktsone*,) it
seems not improbable, that they who were strangers to any
other than a feudal state, might give some sparks of enfranchise-
ment to such wretched persons as fell to their share, by admit-
ting them, as well as others, to the oath of fealty, which conferred
a right of protection, and raised the tenant to a kind of estate,
superior to downright slavery, but inferior to any other condition.
This they called villenage, and the tenants villeins, &c."

(*Black. Com. vol.* 2, *p.* 92.)    See, also, the authorities referred to in the notes to the argument of *Mr. Hargrave, in the Somersett case,* (*State Tr. vol.* 20, *pp.* 36, '7.)    The condition of a villein, had many of the incidents of slavery.    His service was uncertain, and he was bound to do whatever his lord commanded.    He was liable to beating, imprisonment, and every species of chastisement.    He was incapable of acquiring property for his own benefit.    The rule was " *quicquid acquiritur servo, acquiritur domino.*"    He was the subject of property—saleable and transmissible.    If *regardant,* he passed with the manor—if *in gross,* he was an hereditament, or a chattel real, being descendible to the heir when the lord was absolute owner, and transmissible to the executor, when the lord had only a term for years in him ; and his condition of slavery extended to his issue, if both parents, or only the father was a villein, contrary to the rule of the Civil Law, which obtains also here, *partus sequitur ventrem. Coke's Litt.* 116, *b.*    2 *Ro. Abr.* 1.    2 *Inst.* 45.    *Coke's Litt.* 126, '7, 117, *a. Litt.* §§181, 177.    These were their chief disabilities.    But they are broadly and plainly distinguishable from the slave of this country, in this, that they had both a civil and political capacity, neither of which appertains to him.    And first, he was a subject, and as such, under the protection of the Crown.    The lord could neither kill nor maim him.    An appeal of murder lay in his favor against his lord, for the murder of his ancestor ; and if maimed by his lord, he was liable to indictment therefor. *Litt.* §194.    *Coke's Litt.* 116, *b* .    2 *Black. Com.* 94.    2 *Hill's C. R.* 390.    If a subject, he was not unconditionally a slave.    These two things are wholly incompatible.    This is not all.    His civil rights clearly distinguish him from a slave.    He was " able and free, (says *Littleton,*) to sue all manner of actions against everie person, except his lord, to whoom he is villeine." *Litt.* §189.    A *neif,* (a female villein,) had an appeal of rape against her lord.    *Litt.* §190.    It was competent for him to act as executor.    *Litt.* §191.    So, also, he was capable of knighthood, and his person thereby became enfranchised, until, as *Coke* says, *he be disgraded. Coke's Litt.* 136, *b.*    The reason given by *Lord Coke,* for the punishment of a lord for maiming his villein, is

conclusive of his relation to the Crown as a subject. "Nay, (says he,) the lord of a villein, for the cause aforesaid, cannot mayheme the villeine, but the King shall punish him for mayheming his subject, *for that, hereby he hath disabled him to do the King service.*" *Coke's Litt.* 127, *a.* This brief review of the relation of lord and villein, vindicates the proud boast of the British lawyers, that pure slavery never did exist in England, under the Common Law; and it further demonstrates, what will more fully appear, when we look into the *status* of negro slavery, that there is an irreconcilable difference between that and villenage, and it seems to me, also to dispose of the argument drawn from the law of villenage, in favor of the plaintiff in error.

[5.] I now consider the decisions of the English Courts, upon the subject of slavery, and I think it will be seen that slavery has never been recognized to exist there, under the Common Law. On the contrary, it is well settled, that the moment a slave, whether African, Indian, Jew or Gentile, sets his foot upon British soil, he is a freeman, and entitled to the protection of the laws, as such.

[6.] Before doing so, however, it may contribute to the perspicuity of this opinion, to dispose of certain other grounds, upon which it is contended, that slavery has been recognized in England. And first, it is argued that the slave trade is justified by the Laws of Nations, and to this allowance of the slave trade by International Law, England was a party in 1732, when the Colony of Georgia was settled, and thereby sanctioned slavery as an institution in England at that day. Thence follows the inference, that by her laws, which punished the killing of all human creatures, as a felony, it was a felony to kill a negro slave in England.

Whilst it seems to be conceded by Jurists of all civilized countries, that the slave trade is contrary to the laws of nature, upon the principle, that every man has a natural right to the fruits of his own labor, and therefore, no other person can rightfully deprive him of them, and appropriate them against his will; yet, it is also well settled, that it is not prohibited by the Laws of Nations. This principle of the Law of Nations originated in the

Neal *vs.* Farmer.

rights which war was originally held to confer. One of these rights was, that the victor might enslave the vanquished. This idea has been exploded by the States of Christendom, but obtains still, among many of the nations of the earth. Acquiescence in this belligerent right, for long centuries, established the doctrine that traffic in slavery is a lawful commerce. It is nowhere recognized as piracy even at this day, under the Laws of Nations. There can be no doubt, but that this view of the slave trade, has uniformly received the sanction of the English and American Courts. And to the Law of Nations thus understood, Great Britain was a party in 1732—and to this day, she recognizes its obligation upon all the States of the world which have not repudiated it by Statute or treaty. Each State may renounce it for herself, but as no principle is better settled than the perfect equality of nations, no one State can impose a rule on another. And although the traffic in slaves has been made piracy by a number of the States of Christendom, it remains lawful to all such as have not renounced it. *Case of the Antelope,* 10 *Wheat.* 66. *La Jeune Eugenie,* 2 *Mason,* 409. *The Amedie,* 1 *Acton,* 240. *The Fortuna,* 1 *Dodson,* 81. *The Donna Maria,* 1 *Dodson,* 91. *The Diana,* 1 *Dodson,* 95. *The Louis,* 2 *Dodson,* 238. *Madraw vs. Willes,* 3 *Barn. & Ald.* 353. *Greenwood vs. Curtis,* 6 *Mass.* 358. *Forbes vs. Cochrane,* 2 *Barn. & Cres.* 448. *S. C.* 3 *Dowl & Ryl.* 679. *Commonwealth vs. Aves,* 18 *Pick.* 193. Recent case of the negro *Sims* in *Massachusetts,* not yet reported.

Among the nations, the United States led the way in the abolition of the slave trade, and by Statute repudiated the Law of Nations. By the Constitution of 1789, Congress was restrained from passing any law prohibiting the importation of slaves into any State which might think proper to admit them, prior to 1808. Before that time, and as early as 1794, Congress passed a law prohibiting the citizens of the United States from engaging in the slave trade between foreign countries. 1 *U. S. Laws, Story's edit.* 319. This Act was followed by one yet more stringent, in 1800. 1 *U. S. Laws,* 780. In 1803, a law was passed, prohibiting the introduction of slaves into any port or place in the

VOL IX 72

United States, belonging to any State which had, or should prohibit the importation of slaves. 2 *U. S. Laws, Story's edit.* 886. In 1807, Congress prohibited, after the 1st day of January, 1808, the importation into the United States, and the territories thereof, from any foreign place, kingdom, or country, of any negro, &c. as a slave. 2 *U. S. Laws, Story's edit.* 1050. To the violation of these laws, severe penalties were affixed, but they were not found adequate to a prevention of the traffic. In 1820, therefore, the slave trader was declared a *pirate*, and upon conviction was made punishable with *death*. 3 *U. S. Laws, Story's edit.* 1798. These facts have, it is true, but little to do with the question I am considering. I record them as a tribute to the humanity and enlightened policy of our country, upon which slavery has been fixed, not by her own acts, but by the cupidity of her rulers, whilst in a colonial state.

It was not until 1807, that the first British Statute was passed, declaring the slave trade unlawful, contrary, as history tells us, to the wishes of the King, George III. As late as 1788, sixteen years after the decision of the *Somersett case,* it was estimated that the English bought in Africa, annually, about 30,000 slaves ; that in the prosecution of the trade, her manufactures to the amount of 800,000 pounds sterling were exported, in return for which, she received nearly a million and a half pounds ; and that the annual revenue of the government from the slave tax, was 256,000 pounds. In 1824, however, she declared the slave trade piracy, and with great energy exerted her influence among the States of Europe, to procure its abolition, and with such success, that at this day the States of Christendom very generally, have disclaimed the Law of Nations which justified it.

It is true then, that in 1732, when Georgia was settled, Great Britain was a party to the Law of Nations, which held dealing in slaves a lawful commerce. The question is, did this fact recognize slavery in England, as an institution under the protection of the Common Law ? Clearly, it did not. The Laws of Nations are recognized by the Municipal Laws, and will be enforced upon the citizens and subjects of the States parties thereto, *in all cases when a question arises which is the object of their jurisdiction.*

Neal *vs.* Farmer.

They are recognized thus by the Common Law.   4 *Black. Com.* 67, *&c.*   The Law of Nations tolerated, but did not enjoin the slave trade.   The obligation of England under it, was to respect the rights of those States engaged in it, within their own territories, and upon the high seas.   Vessels engaged in the traffic were not liable to seizure and confiscation.   *Her* subjects were also equally entitled to protection under the International Law.   I apprehend, however, that it is historically true, that neither by Statute, nor by usage, has Great Britain ever availed herself of the license of the Law of Nations, to introduce slavery into the island of Great Britain from Africa.   In point of fact, pure slavery never did exist in England—neither by capture in war, by municipal authority, or by the Law of Nations.   Had slaves been introduced into that part of her Empire by municipal authority, or had they been introduced without municipal, that is, without statutory authority, under a trade sanctioned by the Laws of Nations, the *status* of slavery would have been there, just what it is here. Property in the slave—the right to control his person—*his limits,* as *Lord Coke* expresses it, would have existed, and fallen under the protection of the Common Law.   To any correct view of this subject, it is indispensable to distinguish between *Great Britain* and her Colonies.   As to the latter, we know that slavery *there* did in fact, exist, and was sanctioned by usage under the Law of Nations, and by Acts of Parliament; as to the former, we know that it did not exist *there,* and received no such sanction. How could, then, the Common Law attach upon the institution of slavery, in the Island of Great Britain ?   The Laws of Nations would have justified slavery in England, had it been there.   But they did not create it there.   Whether by the comity of nations the English Courts are not bound to deliver a slave, coming into Great Britain from a State where slavery exists by law, to his rightful owner, to be taken back, as was the demand in the Somersett case, is a different question.   *Lord Mansfield* held that they are not.

Nations being equal, the laws of one State have no operation in any other, *proprio vigore.*   But by the comity of nations, contracts made in one State, are enforced in all others, according to

the law of the place where the contracts are made. This is the general rule, founded on the necessities of commerce—the obligations of justice, and the rights of sovereignty. The moral sense of the civilized world, and the perils and injuries of the only ultimate arbiter, war, constitute the guarantee of its observance. Each State, through its constituted authorities, however, has the unquestioned right to determine how far this rule of comity shall extend. Certain exceptions to the rule are recognized, as being well established. Ch. *Kent* generalizes them as follows: " no people are bound, or ought to enforce, or hold valid in their Courts of Justice, any contract which is injurious to their public rights—or offends their morals—or contravenes their policy—or violates a public law." 2 *Kent's Com.* 458. The property in a slave exists in a State where slavery is established, by contract, by gift, or inheritance. When a slave, owned by the citizen of a State where slavery is established, is found within the jurisdiction of a State where it is not established, the comity of nations would seem to us to require, that upon the demand of the owner, he be delivered into his custody ; not to be there retained, but to be taken back to his own country. If the delivery was for the purpose of retaining the slave, within the foreign jurisdiction, and to allow the owner *there*, to exercise the power over his person which the laws of his own State permit, even for a period of time short of the term of domiciliation, the case would come within one of the exceptions, perhaps. The exercise of the rights of the master within the foreign jurisdiction, would establish there the *status* of slavery for a term, at least, and thus might contravene the anti-slavery policy of the State. This could not be, when the delivery is for the purpose (and such would be the terms of the judgment) of immediate removal.

[7.] In *England,* and in *Massachusetts,* the Courts have held that they are bound by the comity of nations, to respect the laws of other States, on the subject of slavery. They have held that a contract made in a slave State for the price of a negro, will be enforced. 20 *vol. State Trials,* 79. 18 *Pic.* 193. *Sims case.* Such a contract then, they being the judges, is not immoral—

is not injurious to their public rights—does not contravene their policy, or violate a public law.  Still, these Courts will not enforce the foreign law, so far as the person of the slave is concerned.  They will not deliver the slave, even upon condition that he be at once taken away.  In the latter case, they take shelter under the idea, that slavery is inherently wrong, and condemned by their public policy.  They do not say that it is violative of a public law, but claim that slavery can alone exist by positive law; and as they have no law which establishes it, when a slave comes into their jurisdiction, he is, *ipso facto*, a freeman.  Now, so far as the ground of immorality is concerned, if good at all, it is as much applicable to a contract for the price of a slave, as to a contract for the body of a slave.  If they enforce the former, they give sanction to slavery—they recognize the person of the negro as a chattel—the subject of sale.  What more than this would they do, if they enforce the latter?  Lord *Mansfield* said, that the laws of England attach upon a *contract* for the price.  Why not upon a *contract* for the person ?  Why should not trover lie in England for a negro, there, bought in Georgia, by a citizen of Georgia, from a subject of Great Britain, resident in England ?  Upon the score of morality—of humanity—or of natural equity, I confess I see no difference.  The ground that their law not recognizing slavery, affords no remedy, is equally untenable.  Their general law giving remedies on contracts, and to recover property, ought to be applied to slaves as other property.  Would a judgment of rendition and removal, violate the anti-slavery policy of a free State ?  It does not engraft slavery upon her institutions—it does not tolerate a slave population in the midst of her freemen.  It restores the slave to the jurisdiction under which he became a slave, there to abide a destiny for which, neither legally nor morally, she is responsible.  It leaves the sin and impolicy of slavery, if it be sinful and impolitic, with the slave State, and leaves her skirts stainless, whilst it responds to that obligation of comity, which is due from one sovereignty to another.  The Apostle to the Gentiles, established the true rule of personal and national obligation upon this subject, when he delivered the refugee slave, Onesimus, back to his master.

Again, it is said that slavery was established in England, by Statutes, which authorized the slave trade to her Colonies, and which recognized its existence in the Colonies. First, as to the facts. If there be guilt or impolicy in the slavery of the American States, it lies at the door of Great Britain, now so fierce in her denunciations of it. She was for years the patroness of the slave trade, and her cherished policy was to stock her transatlantic plantations with negroes. If slavery be a curse, which we do not concede, and which she asserts, it has been entailed upon us by the avarice of British kings, councils and people. Her slave policy ceased only, when she considered her Colonies well stocked. Her vaunted humanity was perseveringly subordinate to her interests. I am convinced that the zeal of *Blackstone,* and the eloquence of *Wilberforce,* would have availed but little, had not *Pitt and Fox,* and the merchants of *Liverpool and Bristol,* believed that the negroes of the Colonies, and their descendants, were sufficient, and would continue sufficient, for all the wants of British Colonial policy. In 1563, Sir *John Hawkins,* an English admiral, patronized by the protestant Queen *Elizabeth,* projected and executed a scheme for capturing, and enslaving, and selling in the West Indies, the descendants of *Ham,* on the continent of Africa. He was eminently successful, and it is said, was rewarded for the benefits conferred upon his country, by the addition of a crest to his coat of arms, consisting of " a demi-Moor, proper, bound with a cord." The trade received the sanction of repeated Acts of Parliament, and of patents from the Crown. By an Act, 9 *and* 10 *Wm. III. c.* 26, negroes are spoken of as merchandise, and by an Act, 5 *George II.* slaves in the West Indies were made saleable there, and subject to pay debts. In most of the American Colonies, there existed an earnest desire, developed in frequent attempts to rid themselves of slavery, which encountered the controlling opposition of the British authorities. Mr. *Madison* says, " the British Government constantly checked the attempts of Virginia, to put a stop to this infernal traffic." South Carolina passed a law to prohibit the farther importation of slaves, which was rejected by the King in council, because it was " beneficial and necessary for the mother country."

*Massachusetts* was the first of the American Colonies to participate in the slave trade, yet, when she was first disposed to stop importations, she was thwarted by the negative of the royal Governor Hutchinson, acting under instructions. The introduction of slaves was prohibited to the Colony *of Georgia* for some twenty years, not from motives of humanity, but for the reason that it was encouraged elsewhere, to wit: the interest of the mother country. It was a favorite idea with the " mother country," to make *Georgia* a protecting barrier for the *Carolinas*, against the Spanish settlements south of her, and the principal Indian tribes to the west. To do this, a strong settlement of white men was sought to be built up, whose arms and interests, would defend her northern plantations. The introduction of slaves was held to be unfavorable to this scheme, and hence its prohibition. During the time of this prohibition, Oglethorpe himself, was a slave-holder in Carolina, and so was Mr. Wesley, one of the best and greatest men of that epoch. During that time, the banner of St. George waved its protecting folds over half a million of slaves. The prohibition gave way in 1751, and the introduction of slaves was legalized by the Trustees, acting under authority from the Crown. Let these statements suffice to authenticate the fact, that slavery was recognized by law, in the British Colonies. *Bancroft's His. U. S. vol.* 2, 171. *Stephens' His. of Geo. vol.* 1, 285, '6, '7, '8. *Tucker's Blackstone, vol.* 1, *part* 2, 49, 51, *appendix. Madison's Papers*, 3, 1390. *Walsh's Appeal*, 327. *So. Carolina Statutes*, 2, 526. *Stephens' Journal*, 3, 281. *New Edinburg Encyclopedia, title Slavery. Encyclopedia Americana, title Slavery, vol.* 2, *p.* 429. 1 *Jefferson's Corresp.* 146. 2 *Elliott's Deb.* 335. 1 *Secret Journal of Congress*, 378, 379. *Story on the Const. vol.* 3, *p.* 203, §1328.

The recognition of slavery in the Colonies, did not establish it in England. This is the answer to the conclusion drawn by counsel. The Statutes of Great Britain do not apply to the Colonies, unless expressly extended to them, and the Acts which relate to the Colonies alone, have a local operation only. Such has been the ruling of the Courts at Westminster Hall. Expressly so held in reference to these very Statutes, in *Forbes vs.*

*Cochrane,* 2 *Barn. & Cres. by Best J. p.* 448. 1 *Black. Com.* 107, '8. 1 *Chitt. Com. Law,* 638.

I return now to a review of the decisions in England, upon the subject of slavery. The authenticated cases in England, before the *Somersett* case, are five in number, to wit: *Butts vs. Perry, in the* 28*th Charles II.* 2 *Lev.* 201, *and* 3 *Keb.* 785. *Gelly vs. Clive, in* 5*th Wm. and Mary.* 1 *Ld. Raym.* 147. *Smith vs. Gould, in* 6*th Anne.* (2. *Salk.* 666.) *Chamberlaine vs Harvey, in* 8*th and* 9*th Wm. III.* (1 *Ld. Raym.* 147. *Carth.* 396. 5 *Mod.* 186,) *and Smith vs. Browne and Cowper,* (2*Salk.* 666.) These cases are not very satisfactory. The first, *Butts vs. Perry,* was an action of *trover* for ten negroes. There was a special verdict, finding that the negroes were infidels—subjects of an infidel prince, and usually bought and sold as merchandize, by the custom of merchants, and that the plaintiff had bought, and was in possession of them. The Court held, that negroes being usually bought and sold among merchants in India, and being infidels, there might be a property in them sufficient to maintain the action. Judgment *ni si.* was given for the plaintiff, and further hearing being asked by the defendant, time was given. Mr. *Hargrove* states, that upon examination of the roll, it appears that final judgment never was given, there being on it, only an *ulterius consilium.* Although this authority is equivocal, yet its weight is in favor of property in slaves. The next case, *Gelly vs. Clive,* was trover for a negro and certain articles of merchandise. The Court held, that trover would lie for a negro, because negroes are heathen. In *Smith vs. Gould,* which was also trover for a negro and other things, the plaintiff had a verdict with several damages and 30 pounds for the negro. On motion in arrest, the Court held that trover could not lie for a negro. The case of *Chamberlain vs. Harvey,* was trespass *vi et armis,* for taking a negro. The Court gave judgment against the plaintiff, but it seems that the judgment went upon a question of pleading, the Court holding that the action should have been for the recovery of damages, for the loss of the service, and not for the value of the slave. So it is authority on neither side. The next case, *Smith vs. Browne and Cowper,* was *indebitatus assump-*

Neal *vs.* Farmer.

*sit* for 20 pounds, the price of a negro, sold to the defendant by the plaintiff, in *London.* The Court ruled in arrest of the judgment, which was given for the plaintiff, that the declaration should have averred that the negro, at the time of the sale, was in *Virginia,* and that by the laws of that State, negroes are saleable. This must be regarded as a judgment, that by the laws of *England,* negroes are not saleable. In this case, Mr. Justice *Powel* is reported to have said, " in a villein, the owner has a property ; the villein is an inheritance, but the law takes no notice of a negro." And Lord Ch. J. *Holt,* " that one may be a villein in England, but as soon as a negro comes into England, he becomes free." Without commenting upon the reasons given for the decision in the two first cases, to wit : that negroes are infidels and heathen, further than to note, that such an idea prevailed very generally, even in *England,* and universally at that, and at an earlier day in other States, and that it seems to have been derived from the authority which God gave the Jews, to take and subdue, and enslave, if they could not convert, the heathen, in the land which was their promised inheritance, I remark, that the authorities before the *Somersett* case, appeared to be pretty equally balanced. A more minute investigation of them is unnecessary, for I hold that the question was distinctly settled in that case, and those that followed it:

In the *Somersett case,* it is very obvious, that Lord *Mansfield* felt his position to be embarrassing. His embarrassment grew out, as he expressed it, of " the extreme difficulty of adopting the relation, without adopting it in all its consequences." He recognized the relation of master and slave—he admitted that a contract for the price of a negro slave, was good in England, because, that was a matter upon which the law would attach. Admitting so much, it was difficult for him, as it is for any man, to deny the right of the master to control the person of the slave. That right, however, he held, was inconsistent with the laws of England. The *person* being the thing in controversy in the case, although *Somersett* was a slave, by the law of his master's domicil, he ruled, that the moment he set foot on the soil of England, he was free. Coming into England, he was, *ipso*

*facto,* a freeman. "The state of slavery, said he, is of such a nature, that it is incapable of being introduced on any reasons, moral or political, but only by positive law—it is so odious, that nothing can be suffered to support it but positive law." 20 *State Tr.* 80. The same doctrine has been held by later cases. *Forbes vs. Cochrane,* 2 *Barn. & Cres.* 448. 1 *Acton R.* 240. *S. C.* 1 *Dodson,* 84. *Idem,* 91, 95. 2 *Idem,* 210. *The slave, Grace,* 2 *Hagg. Adm. R.* 94 *to* 118. 1 *Bing. Com. on Col. and For. Law,* 735 *to* 752. 1 *Black. Com.* 424, 425. *Christian's note, and Coleridge's note.* Independent of the provisions of the Constitution of the United States, it obtains also, in some of the States of our Union. See, on these points *Saul vs. his Creditors,* 17 *Martin's R.* 598. 9 *American Jurist,* 490. *Butler vs. Hooper,* 1 *Wash. C. R.* 499. *Exparte Simmons,* 4 *Idem* 390. *Butler vs. Deleplaine,* 7 *Serg. & Rawle,* 378. 6 *Binny,* 213. *S. C.* 2 *Serg. & Rawle,* 305. 14 *Martin,* 408. 7 *Louis. R.* 170, 172. *Commonwealth vs. Ares,* 18 *Pick.* 193. 6 *Mass. R.* 358. *The recent case of the negro Sims, in the Superior Court of Massachusetts.*

In the case of the slave *Grace,* Lord *Stowell* carried the recognition of slavery farther than it had been previously done in England. He held that a slave brought into England from the West Indies, where slavery is recognized, and voluntarily returning, would be reinstated in his condition of slavery. 2 *Hagg. Adm. R.* 94. Chief J. *Shaw, arguendo,* admits the same thing, in the *Commonwealth vs. Ares,* 18 *Pick.* 193. Neither Lord *Stowell* nor Chief J. *Shaw,* however, holds but that a slave in England or in Massachusetts, becomes free in those places, upon coming into them. We hold it, therefore, settled, upon authority, that *African slavery* does not, and never did exist in England. What then, is the inevitable conclusion? It is, that such a thing as killing a negro slave in England, is a legal impossibility, and could not be a felony under the Common Law. In other words, the Common Law has no application to the condition of slavery in England, or in Georgia. This is the question made in this record, and such is our judgment. It was conceded, on the trial of the *Somersett* case, that there were some

14,000 Africans then in England, and it is asked of what offence would a white man be guilty, who had killed one of them? I answer, felony. Why? Because, upon the principles of the English Courts, he had killed a freeman. Suppose that, upon the trial of such an one, before the *Somersett* case, even, the defence had been filed that it was no crime to kill a slave, the reply of the Court would have been, the deceased was not a slave, but a freeman, in the peace of the King, and under the protection of the laws. There this opinion might terminate, but some farther views of the topics necessarily involved, notwithstanding the length to which it has been extended, will surely be justified, on the ground of their relation to institutions, in which the destiny of Georgia, for weal or for woe, is deposited.

[8.] It is theoretically every where, and in Georgia experimentally true, that two races of men living together, one in the character of masters and the other in the character of slaves, cannot be governed by the same laws. Whatever rights humanity, or religion, or policy, may concede to the slave, they must, in the nature of the relation, be often different from those of the master. The forms of proceeding, and the rules of evidence for their protection, as well as the penalties for their violation, must necessarily, in many instances, be different. The civil rights of the master do not appertain to the slave. Of these, he can have none whatever. The rights personal, if they might be so designated, of the slave, are, some of them, essentially different from those of the master, and cannot, therefore, be the subject of a common system of laws. *They must be defined by positive enactments, which, whilst they protect the slave, guard the rights of the master.* If the Common Law be applicable to a state of slavery, it would seem to be applicable as much in one as another particular. If it protects the life of the slave, why not his liberty? and if it protects his liberty, then it breaks down, at once, the *status* of the slave. The Colonies received the Common Law, as applicable to their condition, that being in numerous particulars different from that of the parent State. They received it as *slaveholding* communities, and as applicable to them as slaveholders. It is absurd to talk about the Common

Law being applicable to an institution which it would destroy. It came to our fathers as the law of the white man, a subject of the British Crown, so far as his circumstances made it desirable to him to appeal to its protection. It recognized slavery only in one point of view, and that is, as an interest to be protected for the benefit of the masters. It may be said, that the Common Law, in protecting the life of the slave, interferes with no right of the master, inasmuch as the master has no right to take the life of his slave. The title to a slave in Georgia now, 'and under the Colonial Government, is not and was not derived from positive law. The faculty of holding slaves was derived from the Trustees of the Colony, acting under authority of the British Crown, as a *civil* right, in 1751, by an ordinance of that board. Before that time, their introduction was prohibited. The regulation of slave property is as much the province of municipal law, as the regulation of any other property, and its protection equally its obligation ; but we deny that property in slaves, and the title by which they are held, are the creations of statutory law. To view this question fairly, let the inquiry go back to a period subsequent to the ordinance of the Trustees, in 1751, and anterior to any legislation upon the subject of slavery. Licensed to hold slave property, the Georgia planter held the slave as a chattel ; and whence did he derive title ? Either directly from the slave-trader, or from those who held under him, and he from the slave-captor in Africa. The property in the slave in the planter, became thus just the property of the original captor. In the absence of any statutory limitation upon that property, he holds it as unqualifiedly as the first proprietor held it ; and his title, and the extent of his property were sanctioned by the usage of nations, which had grown into a law. Property thus acquired in slaves, was *confirmed* by Statute in Georgia, (*Watkins' Dig.* 163,) and recognized by the State Constitution, (*Constitution of* 1798, *art.* 4, §§11, 12, *Prince's Dig.* 913,) and by the compromises of the Federal Constitution. *Cons. U. S. art.* 1, §§2, 9, *art.* 4, §2, *Prince,* 891.

There is no sensible account to be given of property in slaves here, but this. What were, then, the rights of the African chief

in the slave which he had captured in war? The slave was his, to sell, or to give, or to kill. The whole doctrine upon this great question, is summed up by Lord *Coke*, treating of villenage, thus: " *Fiunt etiam servi liberi homines captivitate de jure gentium*, and not by the law of nature; as from the time of Noah's flood forward, in which time all things were common to all, and free to all men alike, and lived under the law natural, and by multiplication of people, and making proper and private things that were common, arose battles. And then it was ordained by constitution of nations, that none should kill another, but that he that was taken in battle, should remain bond to his taker forever, and he to do with him, and all that should come of him, his will and pleasure, as with his beast or any other chattel, to give, or to sell, or to kill." He proceeds to say, that afterwards it was ordained of Kings, that none should kill his villein. *Coke's Litt.* 116, *b.* So that slaves were on the footing of a beast or other chattel. The will of the master was the law of slavery. The limitations of this law—the restraints upon the will of the master, were ordained of Kings, or imposed, as in Georgia, by Municipal Law. There is nothing in the charter of the Colony, in the colonial legislation, in the State or Federal Constitution, or in our State legislation, which conflicts with this view of the original of slavery. On the contrary, as I shall show, the inference is irresistibly drawn from the Colonial Act of 1770, the first Act which punishes the killing of a slave, that such was the view which our ancestors of that day took of the power of the master over the slave. I know very well, that the British Courts, and the Courts of some of our own States, hold that slavery is the creature of what Lord *Mansfield* called *positive law*; yet, it is worthy of remark, that the Courts of Massachusetts have been driven, by the constraining necessities of truth, to say that *positive law* may mean *customary* law. 18 *Pick.* 198. *Case of the negro Sims.* What is definitely meant by *customary* law, they do not declare. It must mean the usages of the State where slavery exists, springing up under the slave trade, and sanctioned by the Law of Nations. Thus it is that we trace property in negroes to Africa. It is immaterial how slavery ori-

Neal *vs.* Farmer.

ginated there; whether as a penalty for offences against the State, or by captivity in war, or by an immemorial and impenetrable slavery cast in some of the tribes of that dark land. It was there, as Lord *Coke* represents it, pure, unmitigated slavery, and so our ancestors received, and so it remained until legislation, prompted by christianity, softened its severities. The curse of the Patriarch rests still upon the descendants of Ham. The negro and his master are but fulfilling a divine appointment. Christ came not to remove the curse; but recognizing the relation of master and servant, he prescribed the rules which govern, and the obligations which grow out of it, and thus ordained it an *institution of christianity.* It is the crowning glory of this age and of this land, that our legislation has responded to the requirements of the New Testament in great part, and if let alone, the time is not distant when we, the slaveholders, will come fully up to the measure of our obligations as such, under the christian dispensation. The laws of Georgia, at this moment, recognize the negro as a man, whilst they hold him property—whilst they enforce obedience in the slave, they require justice and moderation in the master. They protect his life from homicide, his limbs from mutilation, and his body from cruel and unnecessary scourging. They yield to him the right to food and raiment, to kind attentions when sick, and to maintenance in old age; and public sentiment, in conformity with indispensable legal restraints, extends to the slave the benefits and blessings of our Holy Religion. Conceding that there are violations occasionally on the part of the master, of the obligations of humanity, yet it may be asserted, with truth, that the relation of master and slave in Georgia, is an institution subject to the law of kindness to as great an extent as any institution springing out of the relation of employer and employed, any where existing amongst men.

The question whether the Common Law is applicable to slaves, has been considered in some of our slaveholding States, and the decisions are not uniform. In Mississippi it was held, that by the Common Law, it is murder to kill a slave. *The State vs. Jones, Walker's Reps.* 83. So, in Tennessee it was held, that

killing a slave without malice, is manslaughter by the Common Law. 1 *Yerger*, 156. These are the only two cases brought to our notice in the argument. Separating the fervid zeal in behalf of humanity to the slave, from the legal grounds upon which the judgments were rendered in these two cases, we find that they are based upon the fact, that the killing of a villein was a felony at Common Law, and, therefore, the killing of a negro is a felony here. I have endeavored to show, that this ground is wholly untenable. We feel as keenly as these Judges did, the obligation derived from religion and humanity, to punish the killing of a negro; but let it be remembered, that we sit here, not to censure or reprove the errors or crimes of any age or country, but to determine a naked question of law upon legal principles. Besides, there is no necessity that any slave State of this Union should lie under the reproach of not protecting the person of the slave. It is competent for the States, (as indeed they have done without, I believe, a single exception,) to provide, by Statute, protection to the slave. This has been done in Georgia. That the Common Law is not applicable to the *status* of the slave has been decided, and the decisions sustained by the most satisfactory argument and authority in North and South Carolina. *State vs. Boom, Taylor's R.* 103. *State vs. Mann, 2 Dev. Law R.* 263. *Fable vs. Brown's Ex'rs, 2 Hill's S. C. Ch. R.* 378.

[9.] Moreover, the Act of 1770, which is the first Colonial Act providing for the punishment of white men for killing slaves, is perfectly conclusive, that prior to that time it was not an offence against the law—of course the Common Law—to kill a slave, and that there was no limitation of the power of the master over him, except that which religion, or humanity, or interest may be presumed to have imposed. The evidence which this Act furnishes, is derived first from the Act itself. Why legislate at all upon the subject, if the slave was protected by the Common Law? I admit that this alone is not conclusive, particularly for the reason, that the punishment which is prescribed, varies from that which the Common Law imposes for murder; but second, from the recitals in the general preamble to the Act,

Neal *vs.* Farmer.

and of the preamble to that section which creates the offence. The first preamble recites as follows : " Whereas, from the increasing number of slaves in this Province, it is necessary as well to make proper regulations for the future ordering and governing such slaves, and to ascertain and prescribe the punishment of crimes by them committed, *as to settle and limit, by positive laws, the extent of the power of the owners of such slaves over them, so that they may be kept in due subjection and obedience, and owners or persons having the care and management of such slaves, may be restrained from exercising unnecessary rigor or wanton cruelty over them, therefore be it enacted,*" &c. The preamble to the section which creates the offence, recites as follows : " Whereas, cruelty is not only highly unbecoming those who profess themselves christians, but is odious in the eyes of all men who have any sense of virtue or humanity, therefore, to restrain and prevent barbarity being exercised towards slaves, be it enacted," &c. Now, we say that it is clear, from these recitals, that before the Act of 1770, cruelties and barbarities to slaves were exercised, and that there was no restraint upon the power of the master, by law, over his slave. No other inference is possible. The judicial history of the State confirms our judgment. It is not within memory, that a white man has been tried in our Courts for any offence against a slave, not prescribed by Statute. The judicial records show no such case. *Watkins' Digest,* 163.

Let the judgment be affirmed.