Tompkins, J.,
delivered the opinion of the Court.
At the March term of the year 1825, the plaintiffs applied to the Circuit Court of St. Louis county, ibt' leave to sue in that Court, as paupers, for their freedom. Tim* leave heing refused, at the last term of this Court, a writ of mandamus was ordered to the Circuit Court, commanding it to admit the plaintiffs, or to show cause. The plaintiffs now demand a peremptory mandamus on account of the insufficiency of he r eturn of the Circuit Court to the writ of this Court. The Circuit Court returned, that the prayer of the plaintiffs was refused, because ee it appeared by the *435 records of the general Court of and for the Territory of Louisiana, that by a verdict and judgment rendered in said Court, on 6th June, 1806, the absolute slavery of said petitioners was established.-”
The petitioners, plaintiffs in this Court, claimed their freedom as descendants from an Indian woman, and set up no claim to freedom, of a date later than said judgment.
The plaintiffs contend, first, that the Court could not, agreably to law, receive evidence against them, on their application to sue; secondly, that the said judgment will be found to be void. ,
The statute provides, that any person held in slavery, may petition the Circuit Court, praying to be permitted to sue, as a poor person, and stating the grounds on which the claim to freedom is founded; and if, in the opinion of the Court, the petition contains sufficient matter to authorize their interference, the Court shall award the necessary process to bring the cause before them: see Geyer’s Digest, p. 210. The law then provides, that the petitioner shall-have counsel, and liberty of access to such counsel 5 and also, for the security of the person of the petitioner, in case it shall appear, that any undue means are about to be used to frustrate the object of the law. It is plain, that if the claimant of the slave were, on this application, to he permitted to come in, and disprove the matter contained in petition, and thereby prevent the institution of a suit, that every object of the law is defeated; for the applicant has neither counsel nor testimony, and having no means to procure either, may be removed from the jurisdiction of the Court.
But were the Court bound to admit every petitioner to sue, endless vexation would be the consequence. A person against whom judgment had been rendered, might, in the next moment, present his petition to be permitted to sue for the same cause.
This is an extreme case, and not a probable one; hut were such a case to occur, we should not hesitate to say, that the Court should refuse the permission to sue; for the parties to the suit, being- in Court, might move for a new trial, or do any act to render null the judgment, which might lawfully be done, and the Court may reasonably be presumed to know its own records, even for years after the rendition of judgment. But we are not willing to admit, that the Circuit Court has a right to resort to the records of another Court, for evidence in such a case. It might not he necessary to proceed farther, in investigating this matter; hut a desire to know the opinion of the Court, as to the effect of the judgment alledged to have been rendered by the general Court, in 1806, has been expressed, and as we believe that it will he .convenient to both the plaintiffs in this motion, and the persons claiming them as slaves, to have an expression of that opinion, we do not hesitate to express it, — a matter which, to us, appears very plain. Prom the transcript of the record of the general Court, produced here to support the return of the Circuit Court, it appears, that on 9th May, 1806, Joseph Tayon moved the General Court for a warrant to apprehend Celeste, Antoine, Paul, Sophia, Margarctte, daughter of Celeste, Catiche, Carmelite, Mazelite, La Couture, Zabelite, and another named Antoine, who, by said Tayon, were alledged to be his slaves, and running at large, in the district of St. Charles. The Court then gives an opinion, “ that in those cases where slaves may he claimed, and not heretofore decided upon by the Court, that a petition may be presented, supported by affidavit, and that, thereupon, a warrant may issue for the before mentioned slaves, and that the claimant file security in this Court, in the sum of four thousand dollars, conditioned to keep the said slaves subject to the order of *436 this Court, upon investigation. Where one has been declared free, the petition must he made by some claimant not a party to the former claim, and that the petition be supported by the affidavit of disinterested persons.” The opinion makes some further provision for the last mentioned case, which is not material to notice in this case further than to observe, that on the same transcript it appears, that one of the persons named by Tayon in his motion, was set free from the custody of Pierre Chouteau, and immediately claimed by Tayon. It appears that Tayon filed a petition, supported by affidavit, in which he claimed the persons above mentioned, as we Suppose. The petition is not set out. An attorney appears for the reputed slaves, and demands a jury. A jury is summoned, and they find a verdict in these words : “we of the jury do find, that the persons claimed by the petitioner as slaves, are really slaves, the property of the plaintiff, and so we find for the said plaintiff, the said persons in the two petitions mentioned as slaves.” It appears from the transcript, that there was a motion for a new trial, and one in arrest of judgment, both of which were overruled. After overruling the motion for a new trial, the Court made an order, that the plaintiff have the full benefit of his verdict,'by the jurors between the parties aforesaid found. After overruling the motion in arrest of judgment, the Court again orders, that the plaintiff do have the full benefit of the verdict and of the judgment heretofore given. It is our opinion, that no judgment has been given. It-is not’sufficient to say, that the plaintiff have the benefit of his verdict; it was the duty of the Court to enter up a judgment which would show what benefit the plaintiff was to derive from his verdict. It is in vain that it is urged, this is a mere clerical omission. The entry of a proper judgment is not always an easy matter: sometimes judgment is properly entered for the defendant, when the verdict is for the plaintiff, and vice versa.
The Courts will always suffer parties to attend- to the entry of judgments in their favor, and it is expected they will be more vigilant in seeing the record properly made up than the Court possibly can be. But it has been urged that the verdict is a bar; and Fuller v. Mulliner, 2 Johnson, 181, has been cited. In that case it was decided, that a verdict obtained before a Justice of the Peace, was a bar to another action for the same cause, although the Justice had rieglected to enter up judgment on the verdict; because, by the laws of New York, he had no power to arrest a judgment, or grant a new trial, and because, said the Court, we overlook matters of form and regard proceedings before Justices of the Peace according to the merits. But even were there a judgment entered up, in due form of law, we should hesitate to allow it .any effect. That the Court had jurisdiction of the question of freedom or slavery, there can he no dispute ; but whether it ever took jurisdiction of the particular case, is the question here. A warrant was prayed by Tayon to arrest hb runaway slaves, said to fbe in the District of St. Charles, and a warrant was. iásued under the hands and seals of the two Judges in term time. The act of the Governor and Judges, then legislators for the District of Louisiana, for establishing Courts of Judicature, section 10th, provides “ that all writs shall run in the name and style and of the United States of America, and bear teste in the name of the Chief Justice or Presiding Judge, and shall be sealed with the judicial' seal of the said Court; ” hut it is said that by another law it is provided, that the General Court shall have power to direct the writs, summonses, process, and forms, and modes, of proceedings to he issued, observed and pursued by the said General Court. This is Corind in the third section of a law passed by the same Governor and Judges, “ to *437 regulate the practice of the General Court, upon writs of error, and for other purposes ; ” and that this process was awarded by the Court while in session. To this it may be answered, that the two provisions may very well stand together, and that the second by no means repeals the first, although last in order of time. It was still necessary that the writ should bear teste in the name of the Presiding Judge, and be sealed with the judicial seal of the Court. It was still necessary that the writ should show for what purpose those persons were brought into Court. But this writ, if it could be called one, commands the Sheriff to take up some runaway slaves, who next appear in Court as suitors. The statutory provision relied on, allows the General Court to make some general provisions to govern legal proceedings; but in this case the plaintiff has called on the Court to he his counsel in a particular case, for which the law does not provide. The Court is equally the counsel of both parties, and sits to decide between them, not to advise either. Plaintiffs purchase their writs as a matter of right, and it is for themselves to see whether they choose the proper one. It would be a strange doctrine, and a hard one for the defendant, if the first step taken in a cause, and necessarily too taken in his absence, should be supported merely because done by order of the Court. The Court order a writ of error to become a supersedeas, and grant injunctions. But the same Court will, afterwards, on more mature deliberation, entertain a different opinion; and in one of these latter cases, it may be observed that notice to the opposite party is required. The object of the warrant is to cause the slaves to be delivered into the possession of Joseph Tayon, and that being done its force its lost. The appearance of those persons, then, in Court, by attorney, after the return of a warrant of that sort, even had they been free persons, and had the warrant been under the judicial seal of the Court, every thing done afterwards would have been done without any legal authority, and consequently null and void. We have hitherto reasoned as if a master could institute a suit against his slave, or one whom he declares that he holds as a slave. It is not necessary to decide this point, but we are inclined to think that he cannot do it without some statutory provision; for both the civil law and the common law seem to be equally positive. Nor, indeed, can we see why a man should sue his slave. Wherever slavery exists, the master must necessarily by law be authorized to seize his slave, and the humanity of the law provides the means for a person, unjustly held in bondage, to sue his oppressor. But that aperson held in bondage should be compelled to come into Court, and say he is free, and this to be done, too, at the instance of a person claiming his services, appears somewhat strange.
Let a Deramptoiy mandamus go.