## OLIVER *v.* STATE, 39 Miss. R., 526.

### HOMICIDE.

The giving of an instruction philologically inaccurate, but substantially correct, is no ground of error.

An instruction, although it charges the law correctly, being wholly inapplicable to the evidence, should be refused, and it is error in the court to give it.

In cases of resistance and rebellion in a slave, the authority and power of the master is only to be limited by the necessity occasioned by the unlawful resistance to *lawful* authority. If, without necessity, in reducing his rebellious slave to subjection, the master wantonly take his life, he would be guilty of murder or manslaughter, according to the circumstances. Or if the master, by inhuman or brutal treatment, endangering the life or limb of the slave, induce resistance necessary on the part of the slave to save his life or limb, and the master, in the further prosecution of his unlawful conduct, take the life of the slave in such conflict, the master would be guilty of murder.

If the master, in the exercise of lawful authority, in a lawful manner, be resisted by his slave, then the master may use just such force as may be requisite to reduce his slave to obedience, even to the death of the slave, if that become necessary to preserve the master's life, or to maintain his lawful authority.

The giving of an instruction which assumes as proven facts which are not proven, is erroneous.

Error to La Fayette circuit court. THOMPSON, J.

George W. Oliver was indicted in the court below for the murder of his slave, John.

It appears from the evidence that the deceased was a violent, turbulent, and rebellious slave, and that, on the morning of the 14th of March, 1859, he, with several other slaves, was put to shelling corn on a corn-sheller in the corn-crib of Oliver; that in working said corn-sheller, a stick, about five feet long, about two-and-a-half inches in diameter at the large end, and gradually tapering to the other, was used in pushing the ears of corn down into the sheller, and that it was the business of a slave named Dick to use this stick, and that deceased was never allowed to use it on account of his awkwardness. On the morning aforesaid, Dick was as usual using this stick in pushing the ears of corn down, and the deceased was engaged in another department of the shelling. A witness then left the crib, and on his return, about fifteen minutes thereafter, he found the accused, Oliver, in the crib, and he heard him say in a quiet and unexcited tone, " Give up that stick; " and then in a short time he said, violently, " Give up the stick." By this time the witness reached a point where he could see what was going on.

He saw the deceased and accused struggling together for the possession of the stick, both having hold of it. The countenance of the deceased at the time wore a very vicious and savage look. Very soon the accused succeeded in wresting the stick from the hands of the deceased, and he immediately struck deceased on the head with it, and deceased fell, and almost immediately expired. Immediately upon his falling, accused struck in rapid succession two other blows at deceased, but neither of them struck him.

The deceased had been guilty on the day before of an act of disobedience, which was usually punished on the plantation by whipping. It was also proved that the deceased was a very stout and strong man, and the accused a weak and feeble man.

Testimony was introduced on behalf of the accused which tended to show that he was subject to fits of mental derangement; and in the opinion of two of the witnesses—one of whom was a physician—who saw him the day of the killing, he was then not in his right mind, and could not distinguish right from wrong.

The court instructed the jury in behalf of the state as follows:

4. "That manslaughter is the unlawful killing of another in the heat of passion, without malice, in a cruel or unusual manner, and not in necessary self-defense; the law reduces the crime from murder to manslaughter, upon the ground that reason for the time is dethroned and obliterated; and if the jury believe that the defendant killed the deceased at a time when his reason was dethroned by passion, then they will find him guilty of manslaughter only."

7. "That when death ensues from the correction of parent, master, and others having lawful authority, and such correction be considered nothing more than reasonable, the death will be considered accidental; but where, however, the correction exceeds the bounds of due moderation, either in the measure of it, or in the weapon made use of for the purpose, it will be murder or manslaughter, according to the circumstances. If done with a cudgel or other thing not likely to kill, though improper for the purpose of correction, it will be manslaughter. But if it is

done with a dangerous weapon, likely to kill or maim, as a pestle or great staff, it will be murder."

8. "That a master has no right to slay or inflict what the law calls great bodily harm upon his slave; and if the slave has reasonable ground to believe that his master is about to slay him, or do him some great bodily harm, he has a legal right to resist his master; and if the master kills the slave in consequence of such resistance, it will be a felonious homicide, and either murder or manslaughter, according to the circumstances."

9. The ninth instruction was to the effect that a master has no lawful right to correct his slave with a pestle or great staff, or handspike; and that the slave has a legal right to resist the attempt of the master to correct him with such instrument as is likely to produce death.

The eleventh and twelfth instructions asked by the defendant, and refused by the court, are as follows:

11. It is the duty of a slave to obey his master in all lawful things, and to submit to the authority of the master to the full extent that the master has lawful authority over him; and it is the privilege and duty of the master to exercise and enforce his authority; and if the slave resist the lawful authority of his master, and a struggle ensues, in which the master strikes a blow which is necessary to meet and overcome the resistance to such lawful authority on the part of the slave, and death ensue from such blow, such homicide is not manslaughter, but murder.

This instruction was modified by the court, as follows: "But that the master, in enforcing his authority, must do it by lawful means and lawful instruments of correction, and not with a staff, or such means as are likely to kill or maim, and also with due and proper caution."

12. "If the jury believe from the evidence that the defendant killed his slave in lawfully attempting to overcome the resistance of the slave to the lawful authority of the defendant, they cannot convict the defendant unless they are satisfied beyond every reasonable doubt that it was not necessary for defendant, in order to meet and overcome such resistance, to strike the blow which produced death, provided such reasonable doubt arises out of the evidence of this case."

This instruction was given, but with the following modification: "But it is for the jury to determine, from the evidence, whether or not the slave killed did make any resistance to the lawful authority of the defendant; and whether, if deceased made resistance, it was, or was not, to save his life, or protect himself from great personal injury."

Exceptions were taken to the instructions given in behalf of the state, and those refused and modified by the court for the defendant.

The defendant was found guilty, and upon his motion for a new trial being overruled, he excepted and sued out this writ of error.

*H. A. Barr*, for plaintiff in error.

1. The court erred in allowing the state to prove by Cook and Strickland that Brammel told them on the morning of the killing that Oliver had killed his negro; and when they asked him why he did it, he replied, "for nothing"—"that the negro was in the corn-crib, shelling corn, and that he did not seem to work fast enough, and Oliver told him to work faster, and the negro did not do it, and Oliver took the shelling-stick from him and killed him with it." This testimony was clearly inadmissible, and is therefore sufficient grounds to vitiate the verdict and reverse the judgment of the court. 2 Graham & Waterman on New Trials, 613; Penfield v. Carpenter, 13 Johns., 350; Irvine v. Cook, 15 Johns., 239; Marquand v. Webb, 17 Johns., 89; Osgood v. Manhattan, 3 Cow., 612; State v. Allen, 1 Hawks, 6; Anthoine v. Coit, 2 Hall, 40; Craddock v. Craddock, 13 Litt., 77. See also, State v. Engle, 1 Zabriskie, 347; Stephens v. Crawford, 1 Kelly, 574; McMullen v. Mayo, 8 S. & M., 298; Allen v. Parish, 3 Ohio, 107.

The modification to defendant's fourth instruction was clearly erroneous, and calculated to mislead the jury. Dougherty et ux. v. Vanderpool, 35 Miss., 171; Wesley v. State (not yet reported).

The modification by the court to the eleventh instruction was also erroneous, and it lays down the rule that a master must overcome resistance with lawful instruments of correction, and

has no right to use a staff or such means as are likely to kill or maim, in enforcing his authority. If it had been applied and limited to a mere case of correction, where the slave made no resistance, it would have been unobjectionable. But its language is unqualified and unlimited. It covers every imaginable case in which a master may be called upon to enforce his authority. By it the jury were led to understand that it applied to every case of resistance by a slave, no matter how small; and it is not strange that the jury found the defendant guilty of manslaughter; for no matter what they may have thought of the resistance of the slave, they were, in effect, told by the court that the master had no right to overcome it by using the stick which he did use.

Unconditional obedience and submission in all things lawful is the duty of the slave, and authority and power in all things lawful is the right of the master. See State v. Crank, 2 Bail., 66; Jacob v. State, 3 Humph., 513. The right to use the means necessary to maintain authority necessarily grows out of the right of authority itself; for every man has the right to use the means necessary to maintain and enforce the position that he rightfully and legally occupies. Thus, an officer clothed with the authority to arrest a party has a right to use such means as are necessary to complete the arrest; and if resisted when so employed, and the party resisting be killed in the struggle, such homicide is justifiable. Wharton's Am. Cr. Law, 470. And in case of resistance by a slave, the master has the right to employ such means and so much force, to any extent, as will be effectual to subdue him, even to the extent of taking life or limb. Dave v. State, 22 Ala., 23; Mann's case, 2 Dev., 263; Will's case, 1 Dev. & Bat., 121.

The modification to the state's tenth charge enunciates an erroneous rule, which misled the jury. To constitute in law a crime, there must combine a wrongful act and a wrongful intent. 1 Bishop Cr. Law, 253, 254. There can be no criminal intent where the accused is mentally incapable of entertaining it. The jury must find the wrongful act and the wrongful intent before they can declare the accused guilty. But the law requires that, if there be a reasonable doubt as to his guilt, he

shall have the benefit of it, and be acquitted. If the defendant gives evidence of mental incapacity to an extent sufficient to raise a reasonable doubt in the minds of the jury as to whether there was a criminal intent, how can the jury declare that they have no reasonable doubt of the guilt of the accused? The jury must not only be satisfied as to every fact and every intent necessary to constitute the guilt of the accused, but they must entertain no reasonable doubt as to every such fact and intent; for, if they do entertain a reasonable doubt as to any such fact or intent, they cannot say they have no reasonable doubt of the guilt of the accused, because a reasonable doubt as to any element requisite to constitute guilt necessarily creates a reasonable doubt as to the guilt itself. The true rule is, that if the jury, on the whole of the facts on both sides, doubts the guilt of the accused, the benefit of the doubt must be given to him. Commonwealth v. Kimball, 24 Pick., 366; Commonwealth v. Dana, 2 Metcalf, 339, 340.

The defendant was entitled to have the law on this subject correctly declared by the court to the jury. Staten v. State, 30 Miss., 619. A man is not responsible if he insanely believes a certain thing to exist, and acts as he would be justified in doing if what he believed were real. 1 Bishop Cr. Law, 295; McNaughten's case, 10 Cl. F., 200; 8 Scott N. R., 595; Commonwealth v. Rogers, 7 Metcalf, 500.

The mind may be cognizant of the distinction between right and wrong, as regards the act committed, and yet, by reason of some delusion overmastering the will, there may be no criminal intent. In the language of Mr. Erskine, "Reason is not driven from her seat, but distraction sits down upon it, along with her, holds her trembling upon it, and frightens her from her propriety." Roberts v. State, 3 Kelly, 331.

*T. J. Wharton*, attorney general,

Argued the case elaborately on all the errors assigned, and that the modifications of the instructions were correct, and if not, when taken together, they expounded the law correctly, and the verdict should not be disturbed; and cited Mask v. State, 36 Miss., 77.

HARRIS, J. :

Plaintiff in error was indicted in the court below for the murder of his slave, and convicted of manslaughter. Many errors are assigned here, for reversal, which we do not deem it necessary to notice in the view we take of this case. We shall confine our opinion to the *instructions* complained of.

The first objection urged by the plaintiff in error to the instructions of the court, related to the omission of the qualification, " *and not in necessary self-defense,*" in the latter clause of the sixth instruction given for the state. It is evident that this was the idea intended to be conveyed by the instruction, though, perhaps, for greater certainty and accuracy, it would have been better to repeat the qualification in the last clause of the instruction.

It is further insisted that this instruction *assumes* that the killing was " in a cruel and unusual manner." While, in this respect, the instruction may not be philologically accurate in using the word " when " for " if " in the beginning of the sentence, we yet think it was so intended, and substantially conveys the same idea.

It is still further urged, that this instruction was erroneous because it excluded from the consideration of the jury the question *whether the blow inflicted on the negro slave was, or not, necessary to overcome the resistance of the slave to the lawful authority of the master.* This qualification, we think, was not only material, but relates to the most important inquiry involved in the case.

The seventh instruction given for the state, in relation to the doctrine of " correction " by the master, we think was erroneous, *at least,* because inapplicable to the facts shown in this record. There is no evidence (as the case is now presented by the record) tending to show that the master was intending or attempting to *correct* his slave, *submissive to his authority,* and exceeded the bounds of due moderation in the exercise of that undoubted right.

If it is a case of resistance and rebellion, then the authority and power of the master is only to be limited by the *necessity* occasioned by *unlawful* resistance to lawful authority. If, with-

out necessity, or apparent necessity, in reducing his rebellious slave to subjection, the master wantonly take his life, he would certainly be guilty of murder or manslaughter, according to the circumstances.   Or, if the master, by inhuman or brutal treatment, endangering the life or limb of the slave, induce resistance necessary on the part of his slave to save his life or limb, and the master, in the further prosecution of his unlawful conduct, take the life of the slave in such conflict, it is equally certain that the master would be guilty of murder.   But if the master, in the exercise of lawful authority, in a lawful manner, be resisted by his slave, then the master may use just such force as may be requisite to reduce his slave to obedience, even to the death of the slave, if that become necessary to preserve the master's life, or to maintain his lawful authority.

Unconditional submission and obedience to the *lawful* commands and authority of the master is the imperative duty of the slave, as well as the undoubted right of the master.   And the wisdom and origin of this rule is to be traced to the humane reason that upon its proper observance the happiness and welfare of both races, in that relation, necessarily depend.

The eighth instruction given for the state asserts the proposition, *without qualification,* that the "master has no right to slay, or inflict what the law called great bodily harm upon his slave," &c.   In self-defense, or in the exercise of necessary and lawful force in order to secure obedience, he may do both, as we have already seen.

The ninth instruction for the state refers to the doctrine of "*correction,*" which we have just said is inapplicable to the facts of this case, as presented in this record.

The modification of the fourth instruction given for the defendant is clearly erroneous, because it assumes as proven, facts which the jury are to examine and determine for themselves.

The modification of the eleventh instruction given for the defendant is also erroneous, because it limits the right of the master, in subduing resistance and rebellion on the part of his slave, to the use of "lawful instruments of *correction,*" and prohibits the use of "a staff or such means as are likely to kill or maim," without regard to the circumstances or necessities which

might demand the use of either or all to make his authority effectual.

The modification of the twelfth instruction for the defendant is a clear and correct exposition of the law on the subject to which it refers.

Let the judgment be reversed, cause remanded, and *venire de novo* awarded.