# Case No. 17,966.

## WOOD v. WARD.

[2 Flip. 336; 8 Cent. Law J. 188; 25 Int. Rev. Rec. 64; 4 Cin. Law Bul. 42; 7 Reporter, 422.] [1]

Circuit Court, S. D. Ohio. Feb. 15, 1879.

ESTOPPEL BY RECORD — MUTUALITY — JUDGMENT AGAINST SLAVE — VALIDITY — SUIT FOR FREEDOM — LOSS OF JURISDICTION.

1. A slave could not sue, nor be sued, while slavery existed in the slave states. Where, therefore, the judgment of a court was against one who, being kidnapped into slavery, brought suit to regain liberty, the court holding that plaintiff was a slave and not a free person as claimed, such judgment will not estop plaintiff from a re-examination of the same question in a subsequent suit brought against the kidnapping party.

2. Mutuality is an essential ingredient in all estoppels; slaves are not answerable civilly; are subject to no suit; no civil liability can attach to them; they can neither be bound by covenant, nor hindered by estoppel, nor will the law allow them to claim the benefit of an estoppel against others.

3. A judgment rendered against a slave, where he appears in an action, is a nullity. No one can be concluded by a judgment or decree rendered in a judicial proceeding, which he had no legal capacity to prosecute or defend.

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 7 Reporter, 422, contains only a partial report.]

4. Suits for freedom were entertained in the slave states, but upon the idea that the party suing was free. If free, he had a right to sue, but when the court reached the conclusion that he was a slave, that was the end of the litigation for the want of a competent plaintiff, and the proceeding was dismissed without further inquiry.

On motion for new trial.

Lincoln, Smith & Stephens, for plaintiff.
Hoadly, Johnson & Colston, for defendant.

BAXTER, Circuit Judge. The plaintiff is a woman of color. For several years prior to her removal to Cincinnati, she resided with a Mrs. Cirode, in Louisville, Ky., as a slave. About 1847 Mrs. Cirode left Louisville, taking the plaintiff with her and settled in Cincinnati, where she executed and delivered to the plaintiff a formal instrument of emancipation. Thus the plaintiff became, so far as Mrs. Cirode, her apparent owner, could confer the boon, a free person, endowed with all the rights and immunities incident to freedom. And from that time until the restraint imposed by the defendant, to be hereinafter fully stated, the plaintiff remained in Cincinnati, in the undisputed and undisturbed enjoyment of personal freedom.

We infer, however, from the depositions given in another suit (but which are not evidence in this case), to be hereinafter mentioned, between these parties in Kentucky, that the children of Mrs. Cirode claimed some title to or interest in the plaintiff, as a slave, conjointly with or adversely to their mother's title; and that they repudiated their mother's action in the premises, and desired to regain possession of her. But no active steps seem to have been taken to effect that object until the spring of 1853. At or about this time they united in a conveyance, in and by which they professed and assumed to convey the plaintiff as a slave to the defendant in consideration of $300 to be paid in the event he succeeded in obtaining possession of her. The defendant then resided in Covington, Ky. Shortly after said conditional sale, the plaintiff was inveigled by one Rebecca Boyd, in whose service she was then employed, across the Ohio river and into the state of Kentucky, where by chance or pre-arrangement they were met by defendant, who claimed the plaintiff as his slave, forcibly restrained her of her liberty, and sent her back to Lexington, and had her there confined in a private slave prison belonging to one Lewis C. Robards.

Whilst thus imprisoned, to-wit: on the 10th of June, 1853, a petition was filed in the Fayette county circuit court in plaintiff's name for the purpose of regaining her liberty. In it she averred that she was a free woman. To this petition Lewis C. Robards, the proprietor of the prison in which she was detained, was made a defendant. But at defendant's instance an interlocutory order was soon after entered in the cause, substituting the defendant "Zeb. Ward as a defendant in the place of Lewis C. Robards," and dismissing her petition as to Robards.

The defendant Ward then answered, and in his answer alleged "that the plaintiff was not a free woman, but his slave."

Upon the issue thus made proofs were taken and the case regularly heard, when a final decree (24th June, 1854) was entered in the following terms: "This cause having been heard and the court advised, decrees and orders that the plaintiff's petition be dismissed."

From this decree the plaintiff appealed to the court of appeals.

There is no transcript of the record from the court of appeals, and consequently we are not advised of the action of that court, except in so far as the same is supplied by the record offered from the Fayette county circuit court. From this we see that, on the 13th day of February, 1855, the following entry was made in said last named court: "The defendant, Zeb. Ward, produced a mandate of the court of appeals, which is ordered to be recorded as follows: 'Court of Appeals, January 20, 1855. Henrietta Wood, appellant, vs. Zeb. Ward, appellee. Appeal from a judgment of the Fayette circuit court. The court being sufficiently advised, it seems to them that there is no error in the judgment. It is therefore adjudged that said judgment be affirmed, which is ordered to be certified to said court.'"

Here the litigation between these parties in Kentucky terminated. Whereupon the defendant, soon after the termination, sold the plaintiff to one Wm. Pulliam. He caused her to be conveyed to Mississippi and sold to one Girard Brandon. Brandon continued to subject her to his service in the states of Mississippi and Texas until the latter part of 1865, and until she was emancipated by the thirteenth amendment to the national constitution. On being thus the second time emancipated from slavery, the plaintiff began preparations to return to her home in Cincinnati, but owing to various hindrances, not necessary to be enumerated here, she did not get back to Cincinnati until some time in the year 1869.

During all this time, from 1853 to 1870, the defendant resided in Kentucky and Tennessee. He visited Cincinnati in 1870, when this suit was instituted. Plaintiff's petition, which, under the practice in Ohio, is filed as a substitute for a declaration, embodies substantially the facts hereinbefore stated—except those connected with the Kentucky litigation.

The defendant's answer interposed three defenses: First, a general denial of the facts charged; second, the statutes of limitation; third, the adjudication of the Kentucky court hereinbefore referred to.

The plaintiff replied, and the issues thus made came on and were tried at the last April term, 1878, before the honorable the district judge and a jury, resulting in a verdict for the plaintiff, and an assessment of $2,500 damages. [See Case No. 17,966.]

The defendant then moved for a new trial,

and it is this motion that it now before us for determination.

· Defendant's exceptions upon the trial were numerous. He excepted to the rulings of the judge on questions of admitting and excluding evidence, as well as to his instructions given in relation to the statutes of limitation, and in relation to the force and effect of the decree rendered in Kentucky, and pleaded and relied on as a defense to this action.· '

We have neither the time nor the inclination to discuss in detail all the exceptions that were taken, nor is it, in our judgment, necessary for us to do so. If the court fell into error in the admission or exclusion of testimony, or indulged in instructions upon immaterial and abstract matters, the errors in no way affect the merits of this controversy, or prejudice the defendant's right. With the charge relating to the statutes of limitation we are entirely satisfied. The real contest, as we think, arises out of the defendant's third defense, to-wit: "Is the plaintiff, by reason of the decree rendered in her suit, by the Fayette county circuit court of Kentucky, precluded from a re-examination in this court of the same question decided in that case?" If she is, then that judgment is a full and complete defense to this action. The question is an important one. and deserves, as it has received, the most thorough consideration.

The·facts, as we have detailed them, present a case of peculiar and complicated oppression. The plaintiff was quietly, and, as she believed, securely domiciled, under the protection of the laws, in a community friendly to her aspirations, and within a jurisdiction which prohibited slavery, and presumed everything in favor of freedom. But while thus reposing in confidence she was, by false pretenses, decoyed into Kentucky, and there enslaved by violence. It was a most grievous wrong to have been thus betrayed into a distant and unfriendly jurisdiction, in which her color was prima facie evidence of servility, and forced to submit to the deprivation of liberty, or litigate in· a tribunal where the presumptions of law. supposed public policy and established prejudices of long standing, combined to defeat her claim. And when to these we add that, pending the controversy, the plaintiff was prima facie under the ban of slavery with all attendant disabilities, left in defendant's custody, subject to his unrestrained will and amenable to his punishment, and without the means necessary to defray the expenses of litigation, her wrongs appear more and more obvious, and appeal strongly to the sympathies of the court for redress.

But these considerations cannot prevail with the court unless a remedy can be found within recognized legal principles. A judge dare not know any code of morals higher than the constitution and the laws enacted in pursuance of that instrument. These, as they then existed, not only recognized, but protected the slave owner in the enjoyment of that species of property, and we must administer the law as it then existed, uninfluenced by the subsequent change in public sentiment on this interesting subject.

By the national constitution—the instrument under and in virtue of which we hold our office—we are required "to give full faith and credit to the records, public acts and judicial proceedings" of the several states. It follows that the decree of the Kentucky court is entitled at our hands to the same force and legal effect that ought, under the laws of Kentucky, to be accorded to it in that state. The question therefore narrows itself down to the single inquiry: Does the decree rendered by the court of Kentucky and here pleaded and relied on as a bar to this action forever preclude the plaintiff from a re-examination of the issue decided in that case? If it does, as we have already said, it is a complete defense to the plaintiff's present suit. ·

Judgments of courts are not always conclusive upon the litigant parties in collateral or other proceedings. The jurisdiction of the court is always open to inquiry. In order to confer jurisdiction the suit must be by and against parties competent to sue and be sued. But the plaintiff was repelled by the Kentucky court, on the ground that she was a slave. If a slave, she was a chattel, a mere piece of property, without civil rights, and incompetent to prosecute or defend a suit. 14 Am. Cyclopædia, tit. "Slavery," p. 92. This status is inseparably connected with slavery, and has prevailed in the slave-holding states of the Union, including Kentucky, from the time slavery was first legalized to the abolition of the institution in 1865.

Their disabilities have been iterated and reiterated by the courts in a uniform current of decisions, covering almost every possible phase of the subject. Where a slave finds lost property, it inures to the benefit of the master until the true owner can be found. Brandon v. Planters' & Merchants' Bank of Huntsville, 1 Stew. (Ala.) 320. A special plea that either plaintiff or defendants is a slave is a good plea in bar. Amy v. Smith, 1 Litt. (Ky.) 326, and Bentley v. Cleaveland, 22 Ala. 814.

Slaves cannot appear as suitors, either in courts of law or equity. Bland v. Dowling, 9 Gill & J. 19. Nor can a master sue his slave. Catiche v. Circuit Court, 1 Mo. 608. Slaves are incapable of entering into valid contracts, or of taking property, by demise or otherwise, to themselves, directly or through the intervention of a trustee. Hall v. Mullin, 5 Har. & J. 190; Taylor v. Embry, 16 B. Mon. 340; Trotter v. Blocker, 6 Port. (Ala.) 269; Lamb v. Girtman, 26 Ga. 625; Graves v. Allan, 13 B. Mon. 190; Jones v. Lipscomb, 14 B. Mon. 239; Turner v. Smith, 12 La. Ann. 417; Hinds v. Brazealle, 3 Miss. 837; and Cunningham v. Cunningham, Cam. & N. 353. '

Even a bond executed by a slave, with a free man as surety, is against public policy and void. Batten v. Faulk, 4 Jones (N. C.)

233. Money acquired by a slave by permission of his master, inures to the latter. Jenkins v. Brown, 6 Humph. 299.

Courts of chancery, with their ample powers, cannot enforce a contract between master and slave, though fully performed on the part of the slave. 1 Leigh, 72. And a conveyance of lands and slaves in trust, to allow the slaves to occupy and receive the rents of the land, and the profits of their own labor, is void. Smith v. Betty, 11 Grat. 752. It is not felony in Georgia, by the common law, to kill a slave. Neal v. Farmer, 9 Ga. 555. It is lawful to track runaway slaves with dogs, provided it is done with caution and circumspection. Moran v. Davis, 18 Ga. 722. They are recognized, in a restricted sense, as human beings, in this: Masters have no right to inflict such cruel and inhuman punishment, even to enforce obedience, as must result in death or loss of limb as a consequence of the punishment. Craig v. Lee, 14 B. Mon. 119.

But unconditional submission of the slave is due to the authority of the master; and the master may, therefore, use such force and means as may be necessary to enforce submission to his authority, even to the destruction of life or limb of the slave. Oliver v. State, 39 Miss. 526. The law of slavery is absolute authority on the part of the master, and unconditional submission on the part of the slave. And the master may punish the slave at will, in such manner and degree as his judgment and humanity may dictate, provided he does not maim or kill. State v. David. 4 Jones (N. C.) 353. The right of the master to obedience and submission in lawful things is perfect. The power to inflict any punishment not affecting life or limb, which the master considers necessary to enforce obedience to his commands, is secured to him by the law. Now, if in the exercise of his authority, the slave resists and slays the master, it is murder, and not manslaughter, because the law cannot recognize the violence of the master as a legitimate provocation. Jacob v. State, 3 Humph. 493.

Mutuality is an essential ingredient in all estoppels, and as slaves are not answerable civilly; as they are subject to no suit; as no civil liability can attach to them, and they can neither be bound by covenant nor hindered by an estoppel, the law will not allow them to claim the benefit of an estoppel against others. Bentley v. Cleaveland, supra. A judgment rendered against a slave, in an action in which he appeared, is a nullity. Stenhouse v. Bonum, 12 Rich. Law, 620.

From these authorities, which might be indefinitely extended, it will be seen that although slaves are protected as persons against the destruction of life and limb, they are in all other respects treated as property, and subjected to all the disabilities incident to that condition. They are without power to contract, to acquire, or hold property, sue or defend a suit. And being without capacity to sue or defend, no valid judgment can be rendered against them. It would be an anomaly to hold that any one could be concluded by a judgment or decree rendered in a judicial proceeding which he had no legal capacity to prosecute or defend.

It is true that such a suit was brought by the plaintiff, and prosecuted in her name, and that the Kentucky court did entertain, sit in judgment upon and decide it. Similar suits were not infrequent in the courts of the slave states. But these suits were always entertained upon the allegations that the plaintiff was free. If free, the plaintiff had a right to sue; but when the question of freedom was traversed, and put in issue, it was equivalent to denying the plaintiff's right to sue, and whenever the court reached the conclusion that the plaintiff was a slave, the litigation, whatever its scope, necessarily ceased for the want of a competent plaintiff. In other words, the courts held there was no suit pending, and dismissed the proceeding without further inquiry. In Bentley v. Cleaveland, supra, the court ordered the allegation that complainants were slaves to stand as a plea to be first disposed of before it would take cognizance of the other parts of the complaint. The same principle, as we understand the record, was applied by the Kentucky court to the proceeding instituted by the plaintiff against the defendant. Plaintiff alleged her freedom. This, prima facie, gave jurisdiction. But as soon as the court reached the conclusion that plaintiff was a slave, it found itself without jurisdiction for the want of a plaintiff competent to sue, and did the only thing which, under the circumstances, it could have done—struck the case from the docket. The decree simply dismisses plaintiff's petition. There is no declaration of facts, no special findings, no judgment for costs, and no execution awarded.

In the opinion of the court, the plaintiff was defendant's property. She, and all she had, and all that she might afterwards acquire, belonged to him.

To permit such a decree, obtained under such circumstances, against a human being, for the time treated as a chattel, and without legal capacity to sue, to operate as a bar, or an estoppel, and conclude the plaintiff in a matter of such vital importance as is involved in this case, would be a just reproach to the jurisprudence of any country.

On the trial of this case in this court, the plaintiff offered full and satisfactory evidence of her freedom at the time of the committing of the several grievances complained of, whilst defendant offered no opposing testimony. He rested his case wholly on the judgment pleaded and relied on by him. As this judgment does not, in our opinion, conclude the plaintiff, the verdict of the jury must stand. The damages are not excessive; the motion for a new trial will be disallowed, and judgment entered thereon in plaintiff's favor.

NOTE. The learned judge uses the present tense in making quotations from decisions in

slavery cases, but the reader will understand them all in the past tense. In Tennessee, to maim a slave was felony. The writer remembers a case where a wealthy man was sent to the state prison for this offense. The master was liable to be indicted for cruel and inhuman treatment upon a slave. See Werley v. State, 11 Humph. 172. So exposure of slave by master to inclement weather with intent to injure him, was a felony. 2 Code, 831, § 4620. Kidnaping, by section 4621, was, likewise, a felony. The owner of a slave, on a trial of his slave, could attend and aid in his defense, challenge jurors, etc. Section 2634. The law is correctly stated in the foregoing opinion as to his general disability.

This, as it obtained in the Southern States, was the same that has existed in most countries, ancient or modern. Yet it is curious to note that in the dependencies of the crown of Spain, it was and is much more liberal than in most states. If the reader will examine Las Leyes de las Indias, and the royal ordinances for the government of Cuba and Porto Rico, promulgated by the Spanish government, he will learn that a slave in those islands can contract with his master for his freedom. More than that, he may pay his master on account, any sum of money on hand, and have a credit therefor on his purchase of himself. Further, he may buy himself outright, and if his master will not agree to a reasonable price, he can compel him to go before the syndico, an officer who is a sort of trustee as well as judge, by whom the price will be settled. And should the slave be maltreated, he may complain to the same officer, and if the latter thinks a proper case has been made out, he will compel the master to make sale of the slave to another, the slave, in such case, being permitted to choose his master.